## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 01 2017, 8:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stanley F. Wruble III
Wruble Law Group
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Neil Haeck,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 1, 2017

Court of Appeals Case No.
50A04-1606-CR-1503

Appeal from the Marshall Superior Court

The Honorable Robert O. Bowen, Judge

Trial Court Cause No.
50D01-1409-FD-312

**Mathias, Judge.**

[1]     Following a jury trial in Marshall Superior Court, Neil Haeck ("Haeck") was convicted of one count of Class D felony theft. Haeck appeals and presents two

issues, one of which we find dispositive: whether the State presented evidence sufficient to support the jury's verdict. Concluding that the evidence presented by the State was insufficient to show that Haeck exerted unauthorized control over the property at issue, we reverse.

## Facts and Procedural History

In 2012, Haeck was the superintendent of the Marshall County Highway Department. Among his numerous other duties, Haeck was responsible for the budget of the Highway Department. As the Highway Department accumulated scrap metal from sources such as old road signs, old vehicles, and damaged culvert pipes, Haeck would instruct department employees to take the scrap to a nearby salvage yard, Lewis Salvage Corp. ("Lewis Salvage").

At Lewis Salvage, the department's employees would drive the scrap-loaded trucks onto a weighing station, where scales would record the total weight of the vehicle, including the scrap metal. After the scrap metal was unloaded, the trucks would then be reweighed, and the weight of the empty truck would be subtracted from the weight of the loaded truck to arrive at the weight of the scrap metal. A cashier employed by Lewis Salvage then paid the Highway Department employee in cash for the value of the scrap metal. The standard procedure was for the cashier to count the money and hand the money to the truck driver, who signed a ticket to acknowledge their receipt of the payment. Some drivers signed their names but other drivers signed the tickets only in the name of the Marshal County Highway Department. Lewis Salvage photographed the customers receiving the cash and kept business records of its

transactions with the Highway Department. At first, the cashiers bound the cash only with a rubber band but later began to place the cash into envelopes sealed with a piece of tape.

[4] Once the Highway Department truck drivers returned to the county garage, they would typically give the cash to either Haeck, if he was present, or to Shari Miller ("Miller"), who was employed as a clerk and bookkeeper for the department. Miller would give Haeck the cash, if he was in the office, and would place the cash in the inbox on Haeck's desk if he was out of the office. Though this was the usual procedure, it was not the only one employed.

[5] On a few occasions, the drivers gave the cash from Lewis Salvage to Jon Bates ("Bates"), who was a "group leader" or foreman reporting directly to Haeck. Bates would then place the cash in a locked desk drawer and give the cash to Haeck the next morning or whenever he next saw Haeck. Bates counted the money he received and recorded the amount in a notebook he kept. Bates explained that Haeck put the cash in a filing cabinet.

[6] Kurt Mishler ("Mishler") was also a foreman at one point during Haeck's tenure. Mishler received the cash from a truck driver one time when Haeck was not available. He took the envelope containing the cash and placed it in a keyed lock box in his office. Mishler then delivered the cash to Haeck the following day.

[7] At some point after receiving the cash, Haeck would then return it to Miller with instructions to deliver the cash to the Marshall County Auditor's office.

Miller then counted the cash she received from Haeck, prepared a receipt, and delivered the cash to the County Auditor. The Auditor then deposited the cash into the Highway Department's miscellaneous revenue account.

[8] In late 2013, Marshall County Commissioner Deb Griewank ("Griewank") learned of the process regarding the scrap metal and the cash received. She also became aware that there might be a discrepancy between the amount the Highway Department received from Lewis Salvage and the amount the Highway Department deposited with the Auditor. Griewank requested and received records from February 10, 2012, to December 10, 2013, from Lewis Salvage. These records indicated that Lewis Salvage had paid the Highway Department's truck drivers a total of $15,504.98. The cash deposited with the County Auditor, however, amounted to only $3,153.57, a deficit of $12,351.41.

[9] Upon discovering this discrepancy, Griewank met with Haeck to discuss the matter. Haeck appeared very nervous to Griewank, and he informed her that he could not account for the missing money. Although he did not admit to any wrongdoing, Haeck informed Griewank that he did not want his wife to know about the missing money because he feared she would leave him if she thought he stole the money.

[10] Marshall County Attorney James Clevenger ("Clevenger") was eventually informed of the matter and met with the County Commissioners to discuss the matter. Clevenger also met with Indiana State Police Detective Aaron Rypma ("Detective Rypma"), who began an investigation into the missing cash.

Detective Rypma confirmed that there was a large discrepancy between the money that Lewis Salvage had reported giving to the Highway Department and the amount the Highway Department deposited with the Auditor.

On June 23, 2014, Detective Rypma interviewed Haeck for approximately one hour. During the interview, Rypma confronted Haeck with the records from Lewis Salvage showing that the Highway Department received much more money than it deposited with the Auditor. In fact, of all the transactions that occurred during the 2012–2013 period, only in seven cases did the amount reported by Lewis Salvage match the amount deposited with the Auditor by the Highway Department. Haeck denied wrongdoing and claimed never to have paid much attention to the dollar amounts received and deposited, claiming that this was Miller's job. Haeck noted that several others could have also taken the cash but refused to point fingers because he claimed not to have any knowledge of who could have taken the cash or what had happened. Haeck claimed that he did not remember whether he opened the envelopes delivered to him but assumed he had done so, and again claimed not to remember much about the process and not to understand what had happened. The following exchange is typical of the interview:

> [Rypma]: So you want to walk around with an elephant on your chest carrying this with you, or do you want to be straight and get it out in the open.
>
> [Haeck]: I don't know what happened. I don't know what's going on.
>
> [Rypma]: I know you took the money.

[Haeck]: I didn't take nothing.

[Rypma]: Never once?

[Haeck]: (no response).

[Rypma]: See, you can't answer that. You can't tell me. That's one of the reasons why - -

[Haeck]: I said I didn't take nothing.

[Rypma]: Never once?

[Haeck]: I'm kind of - - you're making it tough to sit here. I'm trying to sit here and have - - have - -

[Rypma]: Sometimes I have to make it tough to sit here. It's not easy to sit here and get accused of something and hold onto it.

[Haeck]: Yeah. I'm getting accused.

[Rypma]: Yeah. You are and it's because of what I dug up and I gave you the opportunity to come in here and be straight with me.

[Haeck]: I am being straight with you. But you - - I don't know what you want. Yeah. You want me to say I did something I didn't do.

[Rypma]: I want the truth. I can tell you're not giving me the truth. And I told you this was a voluntary statement.

[Haeck]: You don't want the truth. You just want me to say it that I had some involvement in missing money. That's all you want me to say.

[Rypma]: Is that what you think?

[Haeck]: That's what you're saying.

[Rypma]: I'm telling you I want the truth, so I can tell the prosecutor's office that you cooperated with the case.

[Haeck]: Oh, I told you it was hard sitting here talking to you. Do you not understand that? Me sitting here trying to cooperate with this, but all I get is, hey, Ne[i]l, you done it. You done it. I've got signatures. And you didn't follow up. Ne[i]l, how comes people don't follow up on things.

[Rypma]: Because you're sitting here saying I don't know.

[Haeck]: Well, I don't remember what those amounts were or what happened.

[Rypma]: I didn't ask you to remember any amounts. I'm asking you to tell me about the times you took the money.

[Haeck]: I didn't take no money.

[Rypma]: I'll keep digging then and then just submit it. We'll leave it at that. It's a voluntary statement. You can leave. There's no hard feelings. I would prefer to go a different route, but I'll keep digging.

Tr. pp. 371-373.

[12] On September 16, 2014, a grand jury indicted Haeck on one count of Class D felony theft. A two-day jury trial commenced on March 22, 2016. During the State's case in chief, the State offered into evidence an unredacted copy of the video recording of Detective Rypma's interview with Haeck. Haeck objected based on Evidence Rule 704(b) "to the extent that the officer is giving opinions that should ultimately go to the jury and an opinion as to the truthfulness of Mr. Haeck's statements." Tr. p. 320. Haeck also objected based on Evidence Rule 403 that the probative value of the evidence was outweighed by the danger of unfair prejudice. The trial court overruled the objection, but did admonish

the jury not to consider the detective's questions as evidence. Again, after the video recording was played to the jury, the trial court repeated this admonishment verbatim to the jury. At the conclusion of the trial, the jury found Haeck guilty as charged.

On June 1, 2016, the trial court sentenced Haeck to three years, with one year executed in community corrections and two years suspended to probation. The trial court also ordered Haeck to pay $12,000 restitution to Marshall County. Haeck now appeals.

## Discussion and Decision

When reviewing a claim of insufficient evidence to sustain a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Meehan v. State*, 7 N.E.3d 255, 257 (Ind. 2014). It is the jury's role, not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id*. We will affirm the conviction unless no reasonable fact-finder could have found the elements of the crime proven beyond a reasonable doubt. *Id*. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id*. A reasonable inference of guilt must be more than a mere suspicion, conjecture, conclusion, guess, opportunity, or scintilla. *Id*.

At the time of the acts underlying Haeck's conviction, the statute defining the crime of theft provided:

> A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony.

Ind. Code § 35-43-4-2(a).[1] Of course, "[a] person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so," and "[a] person engages in conduct 'knowingly,' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(a), (b).

[16] Here, the State presented evidence that Lewis Salvage recorded the transactions of its cashiers and had never had any problems with its cashiers stealing money. The State also presented evidence that the drivers who took the scrap to Lewis Salvage returned the cash payment to Haeck or Miller if Haeck was not in his office. If Miller received the cash, she gave it to Haeck when he returned. Haeck then later returned this cash to Miller, who deposited the cash with the Auditor. The State further demonstrated that the cash deposited with the Auditor was several thousand dollars less than that reported by Lewis Salvage to have been delivered to the drivers who had delivered the scrap. Miller and all of the drivers who testified stated that they did not take the cash. Haeck repeatedly told Detective Rypma that he did not know what had happened and did not understand "what was going on," but he never admitted to taking the cash, and

---

[1] This version of the theft statute was in effect from July 1, 2009 to July 1, 2014. *See* Ind. Pub. Law 158-2009 § 8; Ind. Pub. Law 158-2013 § 463.

in fact repeatedly denied it. Tr. p. 371-73. The most incriminating statement Haeck made was to Griewank when he told her that his wife would leave him if she thought he had taken the cash.

[17] This evidence is suggestive of Hauck's guilt, as he had the means and opportunity to take the cash. However, the State presented no evidence that Haeck used the cash, made any unexplained purchases, or explained at all how he spent the cash. Also, the opportunities for theft of the cash were numerous. Indeed, anyone in the chain of events from the cashier to the drivers to Miller to Haeck could have taken the cash given the lack of measures that were in place to keep track of the cash.

[18] We do not consider Haeck's response to Griewank regarding his wife to be conclusively incriminating. That Haeck was worried that his wife would leave him if she thought he took the money does not indicate that Haeck actually did take the money, nor is it unsurprising that Haeck did not want his spouse to know that he was being accused. Despite the State's argument to the contrary, Haeck's interview with Detective Rypma provides little support for Haeck's conviction. Throughout the interview, he repeatedly and consistently denied taking the cash.

[19] In sum, considering only the evidence that favors the jury's verdict and the reasonable inferences that can be drawn therefrom, we conclude that no reasonable jury could conclude beyond a reasonable doubt that Haeck knowingly or intentionally exerted unauthorized control of the cash. Although

the State presented evidence that Haeck had the opportunity to do so, it presented no evidence that Haeck ever actually exerted unauthorized control over the cash. Any inference of guilt created by Haeck's opportunity and his nervousness remained mere speculation or conjecture, not evidence that meets the beyond a reasonable doubt standard that a jury must adhere to. Thus, the evidence is insufficient as a matter of law to support Haeck's conviction.[2]

[20] Reversed.

Kirsch, J., and Altice, J., concur.

---

[2] Because we reverse Haeck's conviction for lack of evidence, we need not address his claim of evidentiary error.